1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MINNESOTA
2
     ------------------------------------------------------------
3                                    )
     UNITED STATES OF AMERICA,       )   File No. 11-CR-188
4                                    )             (RHK/SER)
              Plaintiff,             )
5                                    )
     vs.                             )   Saint Paul, Minnesota
6                                    )   May 11, 2011
     Joaquin Romero Rosas,           )   2:33 p.m.
7                                    )
              Defendant.             )   DIGITAL AUDIO
8                                    )   RECORDING TRANSCRIPT
     ------------------------------------------------------------
9
              BEFORE THE HONORABLE JEANNE J. GRAHAM
10        UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
                **(PRELIMINARY AND DETENTION HEARING)**
11
     APPEARANCES
12    For the Plaintiff:        UNITED STATES ATTORNEY
                                JOHN DOCHERTY, AUSA
13                              300 South Fourth Street
                                Suite 600
14                              Minneapolis, Minnesota 55415

15    For the Defendant:        OFFICE OF THE FEDERAL DEFENDER
                                CAROLINE DURHAM, ESQ.
16                              300 South Fourth Street
                                Suite 107
17                              Minneapolis, Minnesota
                                55415-1329
18
      Transcribed By:           CARLA R. BEBAULT, RPR, CSR
19                              Suite 146 U.S. Courthouse
                                316 North Robert Street
20                              Saint Paul, Minnesota 55101

21

22

23

24        Proceedings recorded by digital audio recording;
     transcript produced by computer.
25

1                          **I N D E X**

2       SPECIAL AGENT DALE OUSE                          PAGE
            Direct Examination by Mr. Docherty            4
3           Cross-Examination by Ms. Durham              11

4

5
        EXHIBITS                                        REC'D
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

**IN OPEN COURT**

1

2

3

4              THE COURT:  We're here today in the matter of the

5     United States versus Joaquin Romero Rosas.  We're here today

6     for a preliminary hearing as well as a detention hearing.

7     May I have appearances, please.

8              MR. DOCHERTY:  Good afternoon, your Honor.  John

9     Docherty for the Government.  Also at counsel table is

10    Special Agent Dale Ouse, O-U-S-E, from US Homeland Security

11    Investigations.

12              THE COURT:  Thank you.

13              MS. DURHAM:  Good afternoon, your Honor.  Caroline

14    Durham on behalf of Mr. Rosas Romero.  He is present as

15    well.

16              THE COURT:  All right.  Good afternoon.  All

17    right.  Are you ready to proceed with the hearings?

18              MR. DOCHERTY:  I am, your Honor.  The United

19    States calls Dale Ouse.

20              THE COURT:  Please come on up.

21              (Witness Ouse sworn by the Court)

22              AGENT OUSE:  I do.

23              THE COURT:  Please have a seat.  Once again can

24    you state your name.

25              THE WITNESS:  Dale Ouse.

1        THE COURT:  And how do you spell Ouse?

2        THE WITNESS:  It's spelled O-U-S-E.

3        THE COURT:  Thank you.

4        Go ahead, counsel.

5                    DIRECT EXAMINATION

6    BY MR. DOCHERTY:

7    Q.  Mr. Ouse, could you please tell the Court what it is

8    that you do for a living and how long you have been doing

9    it?

10   A.  I'm a criminal investigator for Homeland Security

11   Investigations, and I have been doing it since July of 2009.

12   Q.  And before that were you also employed in law

13   enforcement?

14   A.  Yes, sir, I was a Federal Air Marshal for the Federal

15   Air Marshal Service back from 2009 to 2002.  And before that

16   I was a Federal Border Patrol Agent for two years, and

17   before that I was a police officer in the City of Grand

18   Forks, North Dakota.

19   Q.  And have you been in law enforcement since about 1996?

20   A.  Yes, sir.

21   Q.  All right.  Have you been involved in an investigation,

22   Agent Ouse, into allegations that the Defendant here today,

23   Joaquin Romero Rosas, illegally possessed a firearm?

24   A.  Yes.

25   Q.  Can you describe to the Court briefly your role in that

1    investigation?

2    A.  My role in that investigation was determining that

3    Mr. Romero Rosas, his immigration status, and then

4    presenting the courts, the crime hearing in Federal Court.

5    Q.  All right.  You mentioned the Defendant's immigration

6    status in your last answer.  Have you checked the

7    Defendant's immigration status as of the 8th of May of 2011?

8    A.  Yes.

9    Q.  Can you tell the Court how you went about checking his

10   immigration status and what results you obtained, please?

11   A.  I checked the immigration status in two different

12   databases.  The first is called the Central Index, the

13   Central Index System, CIS; and this is commonly where all of

14   the immigration records are kept that the Federal Government

15   uses.  I also checked in a database called the EARM,

16   E-A-R-M.  I'm not sure what the acronym stands for, but the

17   detention and removal office of Immigration and Customs

18   Enforcement tracks all of their immigration courts court

19   cases within this database.

20   Q.  And was the CIS database, the first one you mentioned,

21   is that one that is relied upon by law enforcement officers

22   in performing their duties?

23   A.  Yes, it is.

24   Q.  And in your time as an immigration investigator, have

25   you had occasion to use this database?

1    A.  Yes, I have.

2    Q.  Have you found the database to be accurate and reliable?

3    A.  Yes, I have.

4    Q.  All right.  What results did you obtain when you queried

5    the CIS database for Mr. Romero Rosas's immigration status

6    on May the 8th, 2011?

7    A.  It listed him as EWI, which stands for entry without

8    inspection, which means that he's inside of the United

9    States without inspection, which is illegal.

10   Q.  And when you queried the EARM database for the same

11   information, what results did you obtain then?

12   A.  I learned that he is currently in removal proceedings to

13   remove him from the United States.  He is -- his court case

14   has been continued and his next court date is on -- it's in

15   December of 2011.

16   Q.  I want to direct your attention now to Saturday the 8th

17   of May of 2011.  Did you have occasion as part of your job

18   to be in the area of Lake Street and 4th Avenue South in the

19   City of Minneapolis that day?

20   A.  Yes, I did.

21   Q.  And was that in connection with a Cinco de Mayo festival

22   that was being held in that area?

23   A.  That's correct.

24   Q.  Had you received informant information prior to going to

25   that area that something was going to perhaps occur there

1   that caught your attention as a law enforcement officer?

2   A.  Yes.

3   Q.  Can you describe to the Court, without naming or

4   identifying the informant, the contents of the tip that was

5   received?

6   A.  The information received was that a Surenos gang member

7   named Porky commonly carries a gun and he commonly has it in

8   the passenger compartment of his vehicle.  The license plate

9   was given of the vehicle of Minnesota tag MWA 706.  We were

10  able to run that license tag in a database which informed us

11  that it was a dark green Pontiac Grand Am.

12  Q.  Were you able to do any checking on the nickname Porky?

13  A.  Yes, we were able to run the name Porky through a gang

14  database and it identified Joaquin Romero Rosas as using the

15  name Porky.

16  Q.  Did you then proceed, as you mentioned before, to the

17  area of Lake Street and 4th Avenue?

18  A.  Yes, I did.

19  Q.  Did you meet with Minneapolis police officers at that

20  time?

21  A.  Yes, I did.

22  Q.  And did you convey to those police officers the gist of

23  what you just told to the Court?

24  A.  Yes.

25  Q.  Later on that day were you informed by the Minneapolis

1    police that a traffic stop had been made and an arrest had

2    been made?

3    A.  Yes.

4    Q.  And did you go to the scene of the arrest?

5    A.  Yes, I did.

6    Q.  All right.  Have you spoken with Minneapolis police

7    officers from the Gang Unit concerning the events of May the

8    8th, 2011?

9    A.  Yes, I have.

10   Q.  All right.  At that time was a car with the license

11   plate that the informant had given found?

12          MS. DURHAM:  Your Honor, I'm going to object to

13   the continued leading questions.

14          THE COURT:  Let's try to rephrase.  Sustained.

15   BY MR. DOCHERTY:

16   Q.  Had the Minneapolis Police Department stopped a car?

17   A.  Yes, they had.

18   Q.  All right.  And what correspondence, if any, was there

19   between the license plate on that car and the license plate

20   that the informant had given you?

21   A.  It was the same license plate the informant had given.

22   Q.  All right.  Was the car searched?

23   A.  Yes, it was.

24   Q.  What was found in the car?

25   A.  A small amount of marijuana and a pistol was found

1    behind the stereo.

2    Q.  Can you go into that in a little more detail?  How was

3    the -- could the pistol be seen if the stereo was in place?

4    A.  No.  The stereo was located where a stereo is commonly

5    located in a vehicle in the center dash area and if you --

6    it was an after-market stereo.  If you pulled the stereo

7    out, it came out of the dash and there was a compartment

8    behind the stereo and the pistol was located behind the

9    compartment.

10   Q.  What type of pistol was this?

11   A.  It was a Cobra 380 semiautomatic pistol.

12   Q.  Later on did the Minneapolis police tell you about any

13   statements that the Defendant had made at the scene of the

14   traffic stop?

15   A.  Yes, they did.

16   Q.  Could you describe that to the Court, please.

17   A.  One of the officers was filling out some booking

18   information inside of the squad car and Mr. Romero Rosas

19   asked him what he was being arrested for and the officer

20   told him for a weapons charge.  And Mr. Romero Rosas said,

21   "I have that gun for protection."

22   Q.  Later on was Mr. Romero Rosas taken to the Third

23   Precinct in Minneapolis?

24   A.  Yes, he was.

25   Q.  Was he interviewed there?

1    A.  Yes, he was.

2    Q.  During that interview did he make statements concerning

3    the ownership of that firearm?

4    A.  Yes, he did.

5    Q.  Can you summarize for the Court what he said?

6    A.  He was able to say -- to describe the person that he had

7    purchased the weapon from.  He said that he bought it about

8    a month and a half ago and he had paid $180 for the firearm.

9    Q.  Going back to the scene of the traffic stop, did you and

10   Mr. Romero Rosas have any conversations concerning his

11   immigration status?

12   A.  Yes, we did.

13   Q.  Can you summarize those for the Court, please?

14   A.  I can.  I asked Mr. Romero Rosas if he had any documents

15   allowing him to remain in the United States legally.  He

16   stated he did not.  I asked him if he was in the United

17   States illegally and he said that he was.

18   Q.  And then following, Agent Ouse, did you later place a

19   telephone call to Cobra Firearms?

20   A.  Yes, I did.

21   Q.  What was the purpose of making that telephone call?

22   A.  To determine where they manufactured their firearms.

23   Q.  And what did Cobra Firearms tell you about whether they

24   had a manufacturer in the State of Minnesota?

25   A.  They said that they did not now, nor had they ever in

1    the past, had a manufacturing plant or any offices in the

2    State of Minnesota.

3                 MR. DOCHERTY:  Thank you, Agent.

4                 Your Honor, that's all the questions I have.

5                 THE COURT:  Cross-exam?

6                 MS. DURHAM:  Yes, your Honor.

7                         CROSS-EXAMINATION

8    BY MS. DURHAM:

9    Q.  Agent, who received the information from this informant?

10   A.  I did.

11   Q.  And how did you come to get the information?

12                MR. DOCHERTY:  Your Honor, objection to any

13   questions tending to show the identity of the informant.

14   It's not relevant for today's purpose.

15                MS. DURHAM:  I'm not asking for the identity at

16   this point, your Honor.

17                THE COURT:  You may answer as you can without

18   re -- discussing anything that would identify.  So sustained

19   as to anything other than that.  Go ahead.

20                THE WITNESS:  I spoke with a person.

21   BY MS. DURHAM:

22   Q.  The informant has your phone number?

23   A.  Correct.

24   Q.  Called you out of the blue?

25                MR. DOCHERTY:  Your Honor, same objection.

1          THE COURT:  That will be sustained on that.

2     BY MS. DURHAM:

3     Q.  You in your affidavit state that this is a confidential

4     reliable informant.  Does this individual have open cases,

5     pending cases at this time?

6          MR. DOCHERTY:  Objection.  Same objection.

7          MS. DURHAM:  Goes to the reliability of the

8     information provided and bias in the information given.

9          THE COURT:  Actually I'm not quite sure what

10    you're asking.  What are you asking?

11         MS. DURHAM:  Does he currently have an open case.

12    Are they working off a case at this time and that's why they

13    are an informant.

14         THE COURT:  I'm going to sustain that objection.

15    I think there are other ways you can ask to try to get to

16    the reliability.

17    BY MS. DURHAM:

18    Q.  This is an individual that's currently working for you,

19    yes?

20    A.  Correct.

21    Q.  Working off a criminal case?

22    A.  No.

23    Q.  Attempting to remain in the country by assisting you,

24    Immigration, yes?

25         MR. DOCHERTY:  Same objection, your Honor.

1          THE COURT:  That one I'm going to allow.  What did

2     you say?

3          MS. DURHAM:  He didn't answer.

4          THE WITNESS:  I didn't answer.

5          THE COURT:  I'll allow that.

6          THE WITNESS:  You will allow it?

7          MS. DURHAM:  Yes.

8          THE WITNESS:  I didn't hear.  It is an

9     administrative immigration case.

10    BY MS. DURHAM:

11    Q.  What does that mean?  Explain that to the Court.

12    A.  It means the person is currently in the United States

13    illegally.

14    Q.  And?

15    A.  And is applying for status to remain in the United

16    States legally.

17    Q.  By being a cooperator for law enforcement?

18    A.  Correct.

19    Q.  Okay.  On how many occasions has this individual

20    provided you with reliable information?

21    A.  I can't give that number off the top of my head.

22    Numerous occasions.

23    Q.  More than three?

24    A.  Yes.

25    Q.  More than ten?

1    A.   Around ten.

2    Q.   How long have you worked with the individual?

3    A.   I'd say about nine months.

4    Q.   Okay.  In your affidavit you say that the person

5    indicated that somebody named Porky might have a gun.  What

6    does "indicated" mean?

7    A.   It means they gave the information.

8    Q.   What specifically were you told?

9    A.   That a gang member for Southside Parqueros Surenos may

10   possibly be carrying a gun.

11   Q.   And is this individual that's giving you that

12   information also a gang member?

13            MR. DOCHERTY:  Objection, your Honor.  That goes

14   to the identity of the informant.

15            THE COURT:  Sustained.

16   BY MS. DURHAM:

17   Q.   So who accessed information in the gang database?  Did

18   you do that or another officer?

19   A.   No, I don't have access to it.  Another officer does.

20   Q.   Okay.  So what information is placed in the gang

21   database?

22   A.   I'm not sure entirely what information is in there.  I

23   know that names, identifying information, and then

24   associated police reports.

25   Q.   Photographs, anything like that available?

1    A.  Occasionally, yes.

2    Q.  Was a photograph generated in this case?

3    A.  Yes.

4    Q.  And was it generated prior to the vehicle stop?

5    A.  Yes.

6    Q.  Who was it shared with?

7    A.  I'm not sure.  Minneapolis Police Department had that

8    information.  I know I got a copy of it.

9    Q.  And when did you receive a copy of it?

10   A.  I received a copy of it, I guess it was, several days

11   prior.

12   Q.  Prior to May 8th?

13   A.  Yes.

14   Q.  So Mr. Romero Rosas was already a target for you then?

15   A.  We routinely try to identify gang members who are

16   currently active and just try to determine where they are

17   just in terms of possibly tracking crime or setting them up

18   for interviews if we can do field interviews, things like

19   that.  We didn't know this information until just prior.

20   Q.  But you just said that the information was placed in the

21   gang database some days before May 8th.

22   A.  No, the database isn't for -- you don't put information

23   like that into the database.  The database is solely

24   controlled by the Minneapolis Police Department.

25   Q.  So when did you get the information that a Porky would

1     be at Cinco de Mayo?

2     A.  I believe it was on the 7th, the day before the Cinco de

3     Mayo festival.

4     Q.  The information that was put into the gang database,

5     when was that placed into the gang database?

6     A.  I don't know.

7     Q.  You don't know if it was on the 7th or on the 8th or

8     some other time?

9     A.  I don't know.

10    Q.  Okay.  So you don't know if that information was had on

11    May 8th when the vehicle was pulled over?

12    A.  Which information?

13    Q.  From the gang database.

14    A.  The gang database just identifies who Porky is and the

15    associated police reports.

16    Q.  Okay.  How many other Porkies are in the gang database?

17    A.  I have no idea.

18    Q.  Okay.  No reason to know that there aren't more Porkies

19    than just one?

20    A.  I don't know.  It's possible.

21    Q.  True?

22    A.  I don't know.

23    Q.  So the information is given on May 7th to you?

24    A.  Correct.

25    Q.  And you pass it to other law enforcement agencies on May

1    7th?

2    A.  Correct.

3    Q.  What are the steps that are then taken regarding that

4    information?

5    A.  I guess I'm not sure.  I just pass it onto the

6    supervisor of the Gang Enforcement Team.

7    Q.  Okay.  Were you present when the vehicle was stopped?

8    A.  No, I wasn't.

9    Q.  But you appeared at some point after the vehicle was

10   stopped?

11   A.  Correct.

12   Q.  Why?

13   A.  I was in the area.

14   Q.  Why were you in the area?

15   A.  I was working a detail on the Cinco de Mayo festival.

16   There was a lot of gang violence last year and we were

17   trying to stop some of the gang violence this year.  So

18   there were more officers and agents out working to see if we

19   can lower the level of volume or lower the level of

20   violence.

21   Q.  The information about the vehicle, you said that you ran

22   the tabs to get a description of the vehicle.  That was done

23   on May 7th?

24   A.  No, that was determined on May 8th.

25   Q.  Okay.  By whom?

1    A.   That was passed onto me.

2    Q.   Okay.  Passed onto you from?

3    A.   From the informant.

4    Q.   Okay.  There ends up being a vehicle stop, though, on

5    information you got May 7th?

6    A.   Yes.

7    Q.   How does that vehicle stop happen?  Why is that vehicle

8    stopped?

9    A.   I was told it was because of a traffic violation.

10   Q.   Which would be what type of traffic violation?

11   A.   I believe I read in the police report that the subject

12   was at an intersection and signalled one direction and

13   turned the opposite direction.

14   Q.   Other than Porky may have a gun at Cinco de Mayo, did

15   the informant give you any other -- and the plate of a

16   vehicle, any other information the informant gave you about

17   this Porky that was going to have a gun?

18   A.   No.

19   Q.   Not where to look for the gun?

20   A.   No.

21   Q.   Okay.  Any idea why they would pull a radio out of a

22   dashboard?

23   A.   Commonly gang members will find places to hide firearms

24   so that law enforcement doesn't find them.  That's not the

25   first vehicle that we've heard where they keep weapons

1   behind the -- the dashboard.

2   Q.  Okay.  Who is the car registered to?

3   A.  I'm not sure.

4   Q.  So February 2nd, 2009, Mr. Romero Rosas received

5   information from immigration court that he had a court

6   appearance?

7   A.  I believe that's correct.

8   Q.  Well, that's what you testified to.

9   A.  Yes.

10  Q.  Okay.  So is that in fact true?

11  A.  I'm just testifying off of the reports that are produced

12  by the database.

13  Q.  Right.  So your understanding from the database, what

14  you have testified to is reliable?

15  A.  Yes.

16  Q.  He had an appearance on February 2nd, 2009.  A

17  continuance of that appearance happened.  That's fairly

18  routine in immigration court.  Immigration hearings get

19  continued, true?

20  A.  I'm not sure.  I don't routinely deal with immigration

21  court.

22  Q.  But in any event, he had been on release and has a court

23  date in December of this year?

24  A.  Correct.

25  Q.  And when immigration -- immigration court has the same

1    information or access to the same law enforcement

2    information about a person's criminal history and that sort

3    of thing, true?

4    A.  I'm not sure what they have access to.

5    Q.  But you've not had any experience with immigration

6    court?

7    A.  No.

8    Q.  All right.  Well, you're aware at the time that you got

9    the information regarding when you -- are you aware of the

10   fact that Mr. Romero Rosas has been in the United States for

11   several years?  Are you aware of that fact?

12   A.  Am I aware that he's been in the US for several years?

13   Q.  Yes.

14   A.  That's what he indicates, yes.

15   Q.  And does the immigration records that you reviewed not

16   state that?

17   A.  Yes.

18   Q.  Okay.  And that he has family members here in the United

19   States?

20   A.  I believe I read a report that said his father was here,

21   yes.

22   Q.  And you met his girlfriend, true?

23   A.  Correct.

24   Q.  Pregnant?

25   A.  Correct.

```
 1    Q.  Visibly so?

 2    A.  Yes.

 3    Q.  You're aware of the fact that they have been together

 4    for at least two or three years?

 5    A.  That's what he says.

 6    Q.  No information you have to dispute that, though?

 7    A.  No.

 8    Q.  And she lives here in Minnesota actually in the Twin

 9    Cities, right?

10    A.  That's what she says, yes.

11    Q.  Okay.  You have no information to dispute that, correct?

12    A.  No.

13              MS. DURHAM:  Thank you.  Nothing further, your

14    Honor.

15              THE COURT:  Okay.  Redirect?

16              MR. DOCHERTY:  No, your Honor.  Thank you.

17              THE COURT:  You're excused.  Thank you.

18              THE WITNESS:  Thank you.

19              THE COURT:  Any witnesses?

20              MR. DOCHERTY:  No further witnesses, your Honor.

21    The Government rests.

22              MS. DURHAM:  The defense rests, your Honor.

23              THE COURT:  All right.  Argument on probable cause

24    or on the record?

25              MR. DOCHERTY:  I would submit probable cause on
```

1    the record developed at the hearing here today, your Honor,

2    unless the Court has questions, in which case I would be

3    happy to answer those.

4              THE COURT:  Okay.

5              MS. DURHAM:  I would stand on the record with

6    regard to the probable cause, your Honor.

7              THE COURT:  All right.  Well, my job at this point

8    is to try to determine if there's at least probable cause to

9    move the case forward.  In other words, is there sufficient

10   evidence to make it fair for this case to move forward.  I

11   find that there is probable cause for the crime that's

12   charged against Mr. Romero Rosas and so I will bind him over

13   to Federal Court for further proceedings.  That's just a

14   very long way of saying that the Court will -- the case will

15   continue and there are certain next steps that will happen

16   and your attorney will let you know what those steps are.

17   The case will continue here in Federal Court.

18             All right.  Now we have a motion on detention.

19   Any witnesses on detention other than some of the questions

20   that were asked?

21             MR. DOCHERTY:  No witnesses on detention, your

22   Honor.

23             THE COURT:  Okay.

24             MR. DOCHERTY:  I believe that that topic was woven

25   into both the direct and the cross-examination of Special

1    Agent Ouse.  The Government continues to seek detention of

2    the Defendant.  I believe that the record establishes here

3    today that there is at least probable cause to believe that

4    the Defendant is a gang member who was in possession of a

5    380 semiautomatic that was secreted within the motor vehicle

6    that he was driving.  In addition, there is information

7    concerning the Defendant's criminal history in the bond

8    record.  And finally, the Defendant is illegally present in

9    the United States.

10            For all of those reasons, your Honor, the nature

11   of the offense, the facts of the offense, the Defendant's

12   immigration status -- and I should mention the fact that the

13   Defendant is currently under a detainer from Immigration and

14   Customs Enforcement -- for all of those reasons, your Honor,

15   the Government submits that there is no condition or

16   combination of conditions that would assure the Defendant's

17   appearance in court and would protect the community.  For

18   that reason we seek detention.

19            THE COURT:  All right.

20            Ms. Durham.

21            MS. DURHAM:  Thank you, Judge.

22            Mr. Romero Rosas is before you as an 18-year-old

23   man with a girlfriend of three years who will have a baby in

24   just a month or two.  She's in the courtroom with her

25   parents and his father has come as well.  He has resided in

1    this country for several years.  He has resided and stood by

2    his girlfriend's side, which we don't always see that often

3    with young men in his circumstance.

4            The question is whether he is A, a flight risk.  I

5    would submit that he's not.  He has shown that not only to

6    the immigration court where there has been a pending matter

7    and him allowed to be on release for two years, February of

8    2009 until now -- more than two years.

9            Additionally, his criminal history is such that

10   with one exception it is minor and he has made court

11   appearances for each of those.  No warrants ever issued.

12   And with the exception of a driving offense that happened

13   this past December, he's had no run-ins with the law since

14   2009, and that's significant as well.

15           He was honest in this pretrial report.  He talked

16   about the fact that he has smoked marijuana.  There was a

17   personal use that was found in the vehicle.  Treatment, Rule

18   25, can address that concern.  So A, he is not a flight risk

19   because he has ties to this community.  He has significant

20   reasons to stay and significant reasons to appear.

21           This is not a presumption case.  It is a ten-year

22   max.  And depending on where he falls in the offense level

23   conduct, his sentence guidelines range with acceptance would

24   be anywhere between six months and 24 months depending on

25   which of the levels the Government and probation and I would

1   assert he applies to.  So it's not a significant amount of

2   time.

3          Is he a danger to the community?  There's no

4   indication that that gun was accessible.  There's no

5   indication that he had any intent to use it on that day.

6   You have an individual who lets law enforcement know that a

7   gun is there so that they can stay in this country.  But

8   there's nothing to say that Mr. Romero Rosas has a violent

9   past.  There's nothing to say that he has any intent to use

10  that, and he certainly did not have access to it at the time

11  that he was driving the vehicle.

12         I would ask your Honor that you place him on

13  conditions and if his whereabouts is a concern, he would

14  certainly concede to wearing a GPS system as -- and the ones

15  that our probation office has are very particular.  They can

16  locate on the screen and know exactly where you are.  So

17  we're asking that you place him on conditional release and

18  allow him to return to his job which he has had, return to

19  his family, and take the role of being a father that he

20  wants to do and will have to do no matter what the

21  determination of this Court is.

22         THE COURT:  Okay.  Thank you.  I'm looking at the

23  factors that I have to look at.  I find that the Government

24  has met its burden as far as detention.  I don't see that

25  there is a condition or a combination of conditions that

1    will assure his appearance or the safety of the community

2    and I find that based on the situation that he's in in terms

3    of being here illegally; and now there's a detainer on him,

4    which is different than what the situation was before.

5            He's young.  He's a young man but he's got a

6    serious criminal history that -- and I can't ignore the

7    supplemental information that we have, as well, which points

8    to a serious situation of someone who has apparently, at

9    least in the past and maybe even recently, been involved in

10   a gang situation enough where he has a gun charge from when

11   he was 16 and then he was shot at another celebration, and

12   then this celebration he's got a gun in the car.

13           And based on all of that, I don't find that there

14   is a condition or combination of conditions that will

15   assure -- that portion that I just described is more about

16   the safety of the community.  So I find that detention is

17   appropriate.  I'll ask for a proposed detention order.  And

18   that means, Mr. Romero Rosas, that you will be in federal

19   custody here while the case goes through the system.  Your

20   attorney will tell you what options you have and including

21   challenging my order that I just did, or finding out what's

22   going to happen next as far as possibly a grand jury or

23   etcetera.

24           I acknowledge the family support by acknowledging

25   he previously worked with his particular status and

1    detainer.  I don't think that would be following as far as

2    working.  That was just another thing I was going to say

3    before.  But I acknowledge the family support.  I still

4    don't think that that changes the situation as far as safety

5    of the community.  So that's my ruling.  I'll ask for a

6    proposed order.

7          Is there anything else on behalf of the United

8    States?

9          MR. DOCHERTY:  No, your Honor.

10         THE COURT:  Anything else on behalf of Mr. Romero

11   Rosas?

12         MS. DURHAM:  No, your Honor.  Thank you.

13         THE COURT:  We'll be in recess.  Thank you.

14         (Court adjourned at 3:04 p.m.)

15                *      *      *

16

17

18         I, Carla R. Bebault, certify that the foregoing is

19   a correct transcript from the digital audio recording of

20   proceedings in the above-entitled matter transcribed to the

21   best of my skill and ability.

22

23         Certified by:  s/Carla R. Bebault

24                   Carla R. Bebault, CRR, FCRR

25