## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,                    **Case No.  11-CR-188 RHK/SER**

       Plaintiff,

v.                                           **REPORT AND RECOMMENDATION**

Joaquin Romero Rosas,

       Defendant.

---

Lola Velazquez-Aguilu, David P. Steinkamp, and Michael A. Dees, Esqs., United States Attorney's Office, 600 U.S. Courthouse, 300 South Fourth Street, Minneapolis, Minnesota 55415, for Plaintiff.

Caroline Durham, Esq., Office of the Federal Defender, 300 South Fourth Street, Suite 107, Minneapolis, Minnesota 55415, for Defendant.

---

STEVEN E. RAU, United States Magistrate Judge

The above-captioned case came before the undersigned United States Magistrate Judge on September 21, 2011, on Defendant's Motion to Disclose and Make Informant Available for Interview [Doc. No. 17]; Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Doc. No. 21]; and Motion to Suppress Statements, Admissions, and Answers [Doc. No. 22].  This matter has been referred to the undersigned for the resolution of pretrial matters pursuant to 28 U.S.C. § 636(b)(1)(A) and District of Minnesota Local Rule 72.1.

For the reasons set forth below, the Court recommends Rosas' motions be granted in part and denied in part; the gun seized in the second search and the statements Rosas made in the squad car interview should be suppressed.  Though officers had probable cause to stop Rosas and conduct the first warrantless search of his car, neither probable cause nor any exceptions to the warrant requirement support the second warrantless search.  The Government's witnesses' lack

of credibility undercut its efforts to establish that the gun was lawfully obtained. The squad car interview of Rosas violated *Miranda*; these statements should be suppressed. Rosas' later statement to Officer Lepinski in the squad car regarding the gun and subsequent SCALES Interview at the Third Precinct, however, were lawfully obtained.

## I. BACKGROUND

On May 9, 2011, the Government filed an Indictment charging Defendant Joaquin Romero Rosas ("Rosas") with Unlawful Possession of a Firearm by an Illegal Alien in violation of 18 U.S.C. § 922(g)(5)(A) and § 924(a)(2) [Doc. No. 8]. At the September 21, 2011 pretrial motions hearing, Minneapolis Police Officer Adam Lepinski ("Officer Lepinski") and Minneapolis Police Sergeant Christie Nelson ("Sergeant Nelson") testified on behalf of the Government. Homeland Security Investigator Dale Ouse ("Special Agent Ouse") testified on behalf of Defendant. The Court received three exhibits into evidence: 1) SCALES Interview of Joaquin Romero-Rosas taken on 05/08/11 (Gov't Ex. 1); 2) MPD Squad Video 05/08/11, Tape 2451 Squad 350, P# 76332 (Gov't Ex. 2); and 3) Diagram drawn by Officer Lepinski at the hearing (Def.'s Ex. 5). This matter is set for trial before United States District Judge Richard H. Kyle on December 5, 2011.

When a defendant alleges that evidence was obtained in violation of the Constitution, the Government bears the burden to prove its admissibility by a preponderance of the evidence. *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986). Testimony that is not credible may be discredited and not used as support for the Government's burden. *See United States v. Foster*, No. 10-0049, 752 F. Supp. 2d 1060, 1063, 1067 (PJS/JJK) (D. Minn. Oct. 27, 2010); *see also United States v. Torres*, No. 10-1159, 2011 WL 2209144, at *3 (S.D.N.Y. June 7, 2011). The warrantless searches require a Fourth Amendment analysis; Rosas' statements necessitate evaluation under the Fifth and Sixth Amendments.

## II. FACTS

The sequence of events is undisputed, but the squad car video contradicts Officer Lepinski and Sergeant Nelson's assertions that law enforcement neither asked Rosas incriminating non-biographical questions nor made threats.  (Gov't Ex. 2).  Sergeant Nelson's and Officer Lepinski's accounts are summarized separately because they contain facts that differ significantly from the squad video.  (*Id.*)  The facts below are based on the squad car video, which was incomplete because it was turned off during the continued unlawful interrogation and did not capture the discovery and seizure of the gun.

On May 8, 2011, an anonymous individual called Special Agent Ouse's cellular phone and told Ouse that a Southside Parkeros Sureños gang member named "Porky" was possibly carrying a gun in the vicinity of the Cinco de Mayo Festival on Lake Street in Minneapolis.[1]  (Tr. 78).  Special Agent Ouse did not testify about any additional facts concerning the gun itself such as how "Porky" was carrying the gun or the gun's make and model.  (Tr. 77-78).  The tipster, who said that "Porky" would be travelling in a green Pontiac Grand Am with a Minnesota license tag of MWA 706, was working with law enforcement to remain in the United States legally.  (Tr. 76, 78-79).

At approximately 5:00 p.m., Officer Lepinski, a member of the Gang Enforcement Team on patrol in the area of the Cinco de Mayo festival, received the tip information from Minneapolis Police Sergeant Christopher House.  (Tr. 15-16).  Officer Lepinski was familiar with Rosas, also known by nicknames other than "Porky," including "Chico" and "Pelone."  (Tr. 13-14).

---

[1] The page references cited herein are found in the Transcript of the Motions Hearing, *United States v. Joaquin Romero Rosas*, (11CR188), September 21, 2011 [Doc. No. 39] ("Tr.").

Within an hour, Officer Lepinski spotted a green Pontiac Grand Am one block from the Cinco de Mayo festival on Lake Street at 31st Street East and Fifth Avenue South.  (Tr. 16-17). Consistent with the tip, the vehicle had a Minnesota license plate of MWA 706.  (Tr. 17).  Two blocks later, Officer Lepinski observed two moving violations: the driver failed to activate the appropriate turn signal 100 feet from the intersection and signaled a right turn but turned left. (Tr. 18).

After pulling over the Grand Am, Officers Lepinski and Domek exited their squad car, weapons drawn and yelling, "Get out of the fucking car."[2]  (Tr. 43); (Gov't Ex. 2, at 17:26). Because of officer safety, officers treated the incident as a felony stop based on the tip that someone in the car was carrying a gun.  (Tr. 44, 59-60).  The officers ordered the occupants to exit the car one by one and back towards them with their hands on their heads.  (Gov't Ex. 2). Each of the occupants were handcuffed: the driver (Rosas), the front passenger (Rosas' girlfriend, Tanya), and the back seat passenger (Rosas' family friend, Thomas Daniel).  (Tr. 54); (Gov't Ex. 2, at 17:38).  The officers approached the automobile from the passenger side and looked through the windows in the back first and then the front of the car.  (Tr. 47. 50).  After additional officers arrived on the scene, at least six officers[3] searched the Grand Am for weapons unsuccessfully.  (Tr. 47); (Gov't Ex. 2, at 17:28).

During the search and subsequent interview, Rosas was "secured" in handcuffs and sitting in the back of the squad car.  (Tr. 65).  Rosas was not given a *Miranda* warning.  (Tr. 27, 66).  Officer Lepinski remembered Special Agent Ouse and Sergeant Nelson asking questions of Rosas but did not recall another male officer questioning Rosas at the scene.  (Tr. 48-49).

---

[2] The squad car video recorded one of the officers yelling a similar phrase, "Keep your fucking hands up!" at Rosas' girlfriend after Rosas exited the Grand Am.  (Gov't Ex. 2, at 17:26).

[3] The video tape shows approximately six officers searching Rosas' car in addition to Sergeant Nelson.  (Gov't Ex. 2, at 17:28).

The interview started with officers asking Rosas for biographical information such as his name, address, and form of identification. (Tr. 64). Sergeant Nelson was standing in the open rear passenger side door of the squad car; Special Agent Ouse was nearby.[4] (Tr. 71-72). Officer Lepinski did not ask any questions. (Tr. 24). Rosas was asked if he was in the United States legally, to which he responded that he was hoping to obtain United States citizenship. (Gov't Ex. 2, at 17:43). Officers also asked Rosas about his most recent whereabouts and his movements at the Cinco de Mayo festival. (Gov't Ex. 2)

As the 16-minute interview progressed, the questions became more pointed. (Gov't Ex. 2, at 17:29-45). An unidentified officer on the squad video said to Rosas, "Right now you're looking at a nice vacation stay in a tropical climate. You know what I'm saying? . . . You're not here legally. We can deport your ass tomorrow." (Gov't Ex. 2, at 17:43-44). Special Agent Ouse also said to Rosas, "Get me a gun. . . . If you don't have a gun, get me someone who has a gun. . . . Or I'll deport you."[5] (Tr. 52-53); (Gov't Ex. 2, at 17:44). Ouse's statement was

---

[4] Sergeant Nelson testified that she did not remember whether Special Agent Ouse was seated in the back seat or standing near the open passenger side door during the interview. (Tr. 71-72).

[5] The squad video of the stop captured the following exchange between Rosas and the officers at the scene. The following conversation between Rosas, Sergeant Nelson, and Special Agent Ouse occurred seconds before Officer Lepinski turned off the squad car video tape.

| Special Agent Ouse: | Because at the end of the day you're here illegally right now, and you've fallen into our custody right now. OK? So you can be deported right now for the fact that you are here illegally. |
| --- | --- |
| Joaquin Romero: | OK. |
| Special Agent Ouse: | Got it? |
| Sergeant Nelson: | It's one trip down, all the way, for deportation. |
| Special Agent Ouse: | Maybe we can work something out so you can stay here. |
| Joaquin Romero: | What? |
| Special Agent Ouse: | Give us a gun, today. |
| Joaquin Romero: | Whoa, I don't have one. |
| Special Agent Ouse: | Yeah you do. |
| Joaquin Romero: | No I don't have one. |

recorded and Officer Lepinski testified that he heard it.  (Tr. 53).  Officer Lepinski remembered

Rosas saying that he had a court date with Immigration and Customs Enforcement ("ICE") and

that he could not be deported because he was on bond.  (Tr. 53).  Officer Lepinski also recalled a

male law enforcement officer in the car saying to Rosas, "Well, you're here and you're in our

custody now so you can be deported right now. . . . Maybe we can just work this out.  Give us a

gun."[6]  (Tr. 53); (Gov't Ex. 2, at 17:43-44).  At this point, Officer Lepinski turned off the squad

car's video tape.  (Tr. 53).

In the 45 minutes between when the last officer left the car and when the tape was turned

back on, Sergeant Nelson searched the car for a second time and found a gun in a hidden

compartment behind the stereo.  (Tr. 73); (Gov't Ex. 2, at 17:33-18:18).  Officer Domek took

photos of the gun, unloaded it, and wrote down the serial number.  (Tr. 69).  After the gun was

discovered while Rosas was seated in the squad car, Rosas said to Officer Lepinski, without any

prompting, that he had the gun for "protection."  (Tr. 33-34).  Officer Lepinski did not respond

but rather continued to fill out paperwork.  (Tr. 32).

Officers Lepinski and Domek transported Rosas to the Third Precinct in Minneapolis for

booking.  (Tr. 35).  Rosas asked Officer Lepinski where they were going; Lepinski responded

that they were en route to the Third Precinct.  (Tr. 35).  During that drive, Officer Lepinski had

little interaction with Rosas.  (Tr. 35).

Approximately 20-30 minutes later, Rosas arrived at the Third Precinct and was led to a

second floor interview room.  (Tr. 35-36, 40).  Rosas was handcuffed and seated at a table on the

far side of the locked room opposite Lepinski.  (Tr. 36).  Officer Lepinski testified that

---

Special Agent Ouse:   Okay then, give us somebody else's gun if you're not going to give
us yours.
(Gov't Ex. 2, at 17:44); (Tr. 53).
    [6] The conversation recorded on the squad car video differed only slightly from the
statements testified to at the motions hearing.  *See supra* note 5.

approximately 30 to 45 minutes elapsed between the squad car interview and Third Precinct SCALES interview.  (Tr. 40).  Officer Lepinski asked Rosas his name and read Rosas his *Miranda* rights for the first time during Rosas' detention and arrest.[7]  (Tr. 27, 37, 66).  Rosas waived his *Miranda* rights and did not request to speak with counsel.  (Tr. 37).  Rosas incriminated himself.  (Gov't Ex. 1); (Tr. 57-58).  Officer Lepinski described Rosas as cooperative and respectful; no physical interactions occurred during the interview.  (Tr. 38).  Officer Lepinski testified that Rosas admitted understanding and comprehending English well.  (Tr. 38-38).  After the interview, Officer Lepinski prepared a police report.  On page three of the police report, Officer Lepinski listed the nickname of "Chico" as associated with "Joaquin Romero Rosas."  (Tr. 59).

### A.  Officer Lepinski's Account

Officer Lepinski described his demeanor during the traffic stop as similar to the quiet, demeanor he displayed at the pretrial motions hearing.  (Tr. 38, 42).  Yet, the squad car video recorded two male officers at the initial stop, one of which was presumably Officer Domek, yelling profanities at Rosas.  (Tr. 43); (Gov't Ex. 2, at 17:26).

Officer Lepinski testified that when he first approached the car, he observed a bag containing a green leafy substance near the gear shifter.  (Tr. 21-22); (Def. Ex. 5).  Based on his training and experience, Officer Lepinski believed the bag contained marijuana.  (Tr. 22).  He searched the area of the car where the marijuana was located.  (Tr. 22 ).  This portion of Officer Lepinski's search was not captured on the surveillance video, nor did it show a bag of a green leafy substance being removed from the car.  (Gov't Ex. 2).  None of the officers at the scene physically or verbally signaled that drugs were discovered.  (Gov't Ex. 2).  No photos were taken

---

[7] Officer Lepinski began the 10-15 minute interview with the phrase, "as I said before." (Tr. 57); (Gov't Ex. 1).

of the alleged bag of marijuana in the location in which it was found.[8]  (Tr. 49-50); (Def.'s Ex. 5).

Although he did not have a detailed recollection of Rosas' interview in the squad car, Officer Lepinski characterized the tone as "negative."  (Tr. 26).  Lepinski overheard Rosas say that he did not have a gun, did not know anyone who had a gun, and discussed his immigration status with officers.  (Tr. 53).  According to Officer Lepinski, Rosas was not given a *Miranda* warning during the interview in the squad car because Rosas was not asked any questions about "the incident.[9]"  (Tr. 56).  Officer Lepinski asserted that no one touched Rosas in any way and that he had no recollection of anyone asking Rosas to take his shoes off.  (Tr. 26, 51-52).  Yet, the squad car video recorded an officer asking Rosas to remove his shoes.  (Gov't Ex. 2, at 17:37-38).   Officers also asked Rosas about his tattoos and the video picked-up sounds supporting a reasonable inference that officers may have lifted Rosas' shirt to check for tattoos. (Gov't Ex. 2, at 17:35).

Sixteen minutes into the interview, Officer Lepinski turned off the squad car video because Sergeant Nelson and Special Agent Ouse were trying to "turn" Rosas to reveal criminal acts of others.   (Tr. 28-29).   Officer Lepinski purportedly wanted to protect Rosas' identity out of a concern for his safety.  (Tr. 28-29).  Officer Lepinski turned the tape off without consulting with other officers at the scene.  (Tr. 28-29).

After Sergeant Nelson searched the vehicle for a second time following the interview, Officer Lepinski asserted that Officer Domek gestured with his hands to communicate that Sergeant Nelson found a gun.  (Tr. 32).  The squad video did not capture Domek's gesture because it was turned off.  (Gov't Ex. 2).  Neither Sergeant Nelson nor any other officer testified

---

[8] Rosas did, however, admit that the marijuana was his during the SCALES interview with Officer Lepinski.  (Gov't Ex. 1, at 00:06:19-00:06:34).

[9] Exactly what Officer Lepinski meant is unclear.

to observing the hand signal.  (Tr. 62-75); (Gov't Ex. 2).  The squad video was turned back on 33

minutes later when Rosas gave cash to his girlfriend—documenting the amount and exchange of

cash.  (Gov't Ex. 2, at 18:18).

### B.  Sergeant Nelson's Account[10]

Sergeant Nelson, along with several other officers responding to the scene, assisted with

identifying and arresting Rosas.   (Tr. 63).   She participated in both the first and second

warrantless searches.  Sergeant Nelson also received information that an individual in a green

Pontiac by the street name of "Porky" was suspected to be carrying a gun.  (Tr. 63).  Sergeant

Nelson arrived when Rosas was face down on the ground being handcuffed.  (Tr. 72).

After all three occupants were out of the Grand Am, Sergeant Nelson testified that she

did an initial visual cursory search for weapons by looking in the backseat and lifting up the

center console, which did not yield a gun.  (Tr. 73).  She did not recall which side of the vehicle

she searched first.  (Tr. 71).  The video showed Sergeant Nelson looking into the car and briefly

searching the trunk, conflicting with her testimony that she looked in "the center thing, [and] the

glove thing."  (Tr. 73); (Gov't Ex. 2, at 17: 28:49).  Sergeant Nelson said she did not conduct a

full physical search of the car because there were five to six other officers searching the car.  (Tr.

70).  Sergeant Nelson did not mention any marijuana.  (Tr. 65).  Rather, she recounted seeing

"nothing" in the car upon her initial search.  (Tr. 73).

Sergeant Nelson testified that she asked Rosas only "identifying questions" such as his

name, birthdate, address, girlfriend's identity, and identifying characteristics such as nicknames.

(Tr. 64).  She asserted that the questions she asked did not require a *Miranda* warning.  (Tr. 66-

67).  The squad video contradicts this testimony recording a female voice, presumably Sergeant

---

[10] Sergeant Nelson admitted on cross-examination that her memory of the traffic stop was
not detailed.  (Tr. 72).

Nelson because she was the only female officer at the scene, asking Rosas questions regarding his immigration status, membership in a gang, and location of his alleged gun. (Gov't Ex. 2, at 17:36-17:44). The video also recorded Sergeant Nelson threatening Rosas, "If we were going to show you non-respect right now, you'd still be on the ground bleeding, alright?" and, "It's one trip down, all the way for deportation." (Gov't Ex. 2, at 17:38, 17:44). There is no testimony or evidence about whether Sergeant Nelson was present through the portion of the interview when the camera was turned off. (Gov't Ex. 2, at 17:44). Nevertheless, Sergeant Nelson asked a question several seconds before the tape was turned off, supporting an inference that she continued to participate in the interview. (*Id*.)

Sergeant Nelson testified that she left part way through the unrecorded portion of the interview because she looked behind her and noticed that her squad car was missing.[11] (Tr. 67). She left the scene to make sure that her squad car was not stolen and contacted her partner to confirm that he had taken the squad car on an errand. (Tr. 67).

After the *unMirandized* interview with Rosas and checking on the status of her squad car, Sergeant Nelson conducted a second search of Rosas' car. (Tr. 67-68, 72-73). The only justification she gave for going back to the vehicle for a second search was thoroughness and wanting to "give it the last college try." (Tr. 68-69). Sergeant Nelson received Drug Enforcement Agency training on finding hidden compartments and specific things to look for such as non-matching screws and other anomalies. (Tr. 68). During this search, Sergeant Nelson claimed that she noticed the stereo was not flush with the dashboard. (Tr. 69). She pulled out the stereo and observed that there was a handgun tucked on the right hand side of the

---

[11] Sergeant Nelson's departure was not captured on the squad video because it was turned off. (Gov't Ex. 2, at 17:45-18:18).

stereo compartment.  (Tr. 69).  Sergeant Nelson alerted the other officers at the scene.  (Tr. 69).

She summarized her involvement as she "arrived and spoke and searched and found."  (Tr. 72).

## III. DISCUSSION

Significant discrepancies exist between the Government's witnesses' testimony and the squad car video.  Fifteen times in eight pages, the Government refers to the inconsistencies in Officer Lepinski's[12] and Sergeant Nelson's testimony as "innocent," "inconsequential," or "immaterial."  (Gov't Mem. at 31-38).  The Government attempts to minimize the relevance of both officers' incorrect statements suggesting that the mistruths are unimportant.  No mention is made of the fact that Sergeant Nelson, the same officer who found the gun after the unlawful interview, was recorded on the squad video making threats.  (Gov't Ex. 2, at 17:38, 17:44).  At the suppression hearing, Sergeant Nelson testified that she did not ask Rosas anything beyond biographical questions.  (Tr. 72).  Threatening a handcuffed suspect in the back of a squad car and asking questions intended to incite incriminating responses, however, goes well-beyond biographical information.  These inconsistencies are central to determining the credibility of Nelson's assertion that her second warrantless search of Rosas' car was to "give it one last college try" based on the tip information.  (Tr. 68-69).

Although neither party distinguished between the searches, previous courts in this District have delineated between an initial search and a subsequent search of a hidden compartment.  *See United States v. Guzman*, No. 09-234, 2010 WL 234730, at *5 (D. Minn. Jan. 14, 2010); *United States v. Valencia*, No. 06-162, 2006 WL 2385154, at *4 (D. Minn. Aug. 17, 2006); *see also United States v. McGregor*, 650 F.3d 813, 818 (1st Cir. 2011).  Nelson conducted a cursory search of the trunk during the first search—not the center console as she testified.  (Gov't Ex. 2

---

[12] Officer Lepinski's inconsistencies were less material than were those of Sergeant Nelson, which justifies discrediting only a portion of his testimony.

at 17:28:08); (Tr. 73).   Approximately 40 to 45 minutes before Sergeant Nelson discovered the

gun, six or seven officers thoroughly searched Rosas' car for drugs and weapons, found nothing

aside from the marijuana, and left the car.  (Gov't Ex. 2, at 17:28-33, 18:18).   According to her

testimony, between the first and second search, Sergeant Nelson left the scene and returned

sometime during the 33-minute gap in the video recording, which demonstrates a clear break

between the first and second searches.  (Tr. 67); (Gov't Ex. 2, at 17:45-18:18).  This Court finds

and believes that each search requires a separate and independent analysis.  The squad video

recorded the first search and shows that it was part of the same continuous chain of events

beginning with the traffic stop.   The second warrantless search, in contrast, occurred after

Sergeant Nelson left the scene and returned, was not recorded, and yielded the very contraband

that was the subject of the alleged unlawful questioning.

> With respect to warrantless searches, the Supreme Court has reiterated "the basic rule of

Fourth Amendment jurisprudence" as follows:

> The Fourth Amendment proscribes all unreasonable searches and seizures, and it is
> a cardinal principle that searches conducted outside the judicial process without
> prior approval by judge or magistrate are per se unreasonable under the Fourth
> Amendment-subject only to a few specifically established and well-delineated
> exceptions.

*Horton v. California*, 496 U.S. 128, 133 n. 4 (1990) (quoting *Mincey v. Arizona*, 437 U.S. 385,

390 (1978)).  The exceptions to the Fourth Amendment warrant requirement relevant to a search

of a vehicle are: 1) exigent circumstances; 2) search incident to arrest; 3) consent; 4) automobile

exception; 5) plain view; 6) inventory search; and 7) protective *Terry* search.[13]  *See generally* 3

Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, § 7, 501-687 (4th

ed. 2004).

---

[13] Neither party argues that the exigent circumstances or the consent exceptions apply; a discussion of these exceptions is unnecessary.

The first search was a valid protective *Terry* search, which expanded into a full search supported by probable cause after Officer Lepinski discovered the marijuana in plain view. Officers conducted a thorough probable cause search for weapons during the first warrantless search and did not find a weapon. Based on Sergeant Nelson's testimony and the fact that the first exhaustive yet unfruitful six-person search for weapons had concluded, the only justifiable basis for the second warrantless search was the tip. (Tr. 68-69). The tip alone, however, was insufficient to establish probable cause to support a second search of the car including the hidden compartment containing the gun. Because no warrantless search exception applies to the second search, the gun should be suppressed.

**A. Officers Had Sufficient Probable Cause to Support the First Search of Rosas' Car.**

"[S]o long as police have probable cause to believe that a traffic violation has occurred, the stop is valid. . . ." *United States v. Thomas*, 93 F.3d 479, 485 (8th Cir. 1996); *see United States v. Olivera-Mendez*, 484 F.3d 505, 509 (8th Cir. 2007) (allowing officers to stop a vehicle if the officer(s) have probable cause that a traffic violation occurred). Stopping a vehicle after observing an illegal turn or a driver's failure to signal is "objectively justified." *United States v. Stachowiak*, 521 F.3d 852, 853-55 (8th Cir. 2008) (citing *Whren v. United States*, 517 U.S. 806, 813 (1996)). A vehicle stop is considered a seizure under the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). Whether the officer could have ignored the violation if he or she did not suspect a greater crime was afoot is irrelevant. *See Whren*, 517 U.S. at 813; *United States v. Luna*, 368, F.3d 876, 878 (8th Cir. 2004).

**1. Traffic Stop and Detention.**

Two observed moving violations gave Officers Lepinski and Domek probable cause to conduct a traffic stop and seize Rosas. After stopping a vehicle, an officer is "entitled to conduct

an investigation reasonably related in scope to the circumstances that prompted it." *United States v. Collier*, 419 Fed. Appx. 682, 684 (8th Cir. 2011) (citing *United States v. Shafer*, 608 F.3d 1056, 1062 (8th Cir. 2010)). "The officer also has the authority to inquire into the driver's destination, check the driver's license and registration, or to request that the driver step out of the vehicle." *Id.* at 685 (citing *United States v. Payne*, 534 F.3d 948, 951 (8th Cir. 2008)); *see Maryland v. Wilson*, 519 U.S. 408, 415 (1997). The duration of the stop can be as long as reasonably necessary to issue a citation, conduct a criminal history search, and conduct a routine investigation. *Payne*, 534 F.3d at 951. A traffic stop can, however, become unlawful if it is longer than necessary. *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).

The traffic violations by themselves justified Officers Lepinski's decision to pull Rosas over. *Stachowiak*, 521 F.3d 852, 853-55. Officer Lepinski lawfully ordered Rosas out of the vehicle, inquired into his destination, and asked for Rosas' name, driver's license, and registration. *Payne*, 534 F.3d at 951. In order to expand the traffic stop into a protective search of Rosas' vehicle, however, the Government must establish reasonable suspicion demonstrating a threat to officer safety. *See Michigan v. Long*, 463 U.S. 1032, 1049 (1983); *United States v. Long*, 320 F.3d 795, 800 (8th Cir. 2003).

### 2. The First Protective Search was Valid Based on the Tip.

The Government relies on the tip information to broaden the scope of the traffic stop into a protective *Terry* search for weapons. Prior to the traffic stop, Officer Lepinski was following Rosas based on the tip from a confidential informant that Rosas, an alleged gang member with the nickname "Porky," would be travelling in a green Grand Am, license plate tab Minnesota MWA 706, in the vicinity of the Cinco de Mayo Festival on Lake Street in possession of a gun. This tip caused Officer Lepinski treat the incident as a felony stop. (Tr. 44, 59-60). Evaluating

the informant's reliability and credibility is a crucial first step in analyzing the lawfulness of the first warrantless search.   Based on officer safety concerns, the Government argues a lower standard of reasonable suspicion applies to the search of Rosas' vehicle rather than the higher probable cause standard.   Four types of informants[14] exist: 1) anonymous unproven informants, 2) anonymous proven informants, 3) known unproven informants, and 4) known proven informants.   At best, the informant in this case is a known unproven informant whose tip gave rise to reasonable suspicion to conduct a protective *Terry* search.   The distinction between anonymous informants, tipsters, and known informants is relevant to determining the credibility and reliability of the tip.   *See United States v. Kent*, 531 F.3d 642, 649 (8th Cir. 2008); *see also United States v. Rovario*, 353 U.S. 53, 60-61 (1957).   A tipster, as opposed to an informant, "merely conveys information but does not witness or participate in the offense." *United States v. Bourbon*, 819 F.2d 856, 860 (8th Cir. 1987).   Unproven informants, in contrast, "are individuals without a track record of supplying information to law enforcement officers." *United States v. Nolan*, 536 F.3d 834, 840 (8th Cir. 2008).   "Though less reliable than informants with a proven record, unproven informants are more reliable than anonymous tipsters because the police can hold them responsible for false information." *Kent*, 531 F.3d at 649.   Nevertheless, the Government must establish the reliability of information that an unproven informant or tipster supplies.   *Id*. (citing *United States v. Brown*, 49 F.3d 1346, 1349 (8th Cir. 1995)).   Police officers' independent observations of even "minor, innocent details," can corroborate a tip's reliability.   *United States v. Buchanan*, 574 F.3d 554, 562 (8th Cir. 2009) (quoting *United States v. Tyler*, 238 F.3d 1036, 1039 (8th Cir. 2001) (analyzing known informant's statement against

---

[14] The generic term "informant" encompasses informants and tipsters, a distinction that will be addressed in Section G.  The Government uses these terms interchangeably in its briefs. *See* [Doc. Nos. 33, 44, at 14].

penal interest as sufficiently reliable based on corroboration of defendant's nickname and description of his car)).

The tip information conveyed to the Gang Enforcement Team provided officers at the scene with a reasonable and articulable suspicion—as opposed to probable cause—that Rosas may possess a firearm.  The Government has not provided any information about the known informant aside from the fact that he or she was working with the Government in exchange for assistance with obtaining citizenship.  The record lacks information as to whether the tipster provided reliable information in the past, had personal knowledge of Rosas' gun possession, or made statements against his or her penal interest.  *See Tyler*, 238 F.3d at 1039; *United States v. Jackson*, 898 F.2d 79, 81 (8th Cir. 1990).

Based on the limited information provided to the Court, the informant in this case is a known unproven informant.  At the time of the stop, Officer Lepinski corroborated: 1) the color of the car; 2) the license plate number; 3) the whereabouts of the vehicle; and 4) the driver's identity.[15]  The strength of the tip corroboration in the totality of the circumstances supports reasonable suspicion to justify a *Terry* protective search despite the absence of information regarding the tipster or his or her reliability.

### 3.  Scope of the First Warrantless Search.

The totality of the circumstances is analyzed in evaluating whether an officer's reasonable suspicion is sufficient to expand the scope of a *Terry* stop.  *See United States v. Binion*, 570 F.3d 1034, 1039 (8th Cir. 2009) (citing *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)).  In *Michigan v. Long*, 463 U.S. 1032, 1037 (1983), the United States Supreme Court

---

[15] Rosas makes much of the fact that he was also known by the nickname, "Chico" and that Officer Lepinski wrote this nickname on his police report rather than "Porky." (Tr. 59).  Yet, based on past encounters, Officer Lepinski associated Rosas with the nickname, "Porky" and recognized him when he exited the vehicle.  (Tr. 14).

held that for safety reasons, officers conducting a traffic stop that have articulable suspicion that occupants of the car may be dangerous may pat down the individual and search the car's interior for weapons.  A protective search is permissible even if the suspect is handcuffed or otherwise detained because the suspect could potentially break free and retrieve his or her weapon during or after the search.  *See United States v. Stewart*, 631 F.3d 453, 457-58 (8th Cir. 2011); *United States v. Garcia*, 441 F.3d 596, 598 (8th Cir. 2006), *see also McGregor*, 650 F.3d at 826 (reasoning that defendant could access the hidden compartment in the car "in a matter of **seconds**") (emphasis in original) (internal citation omitted).

In determining the permissible scope of the first warrantless protective search of Rosas' car, *United States v. McGregor*, 650 F.3d 813, 818 (1st Cir. 2011) is instructive.[16]  In *McGregor*, officers conducted a protective search for weapons after a gang-related shooting and discovered a loaded gun and crack cocaine in several hidden compartments in the defendant's car.  650 F.3d at 817-818.  The officer that made the discovery testified that he suspected the defendant's car contained a hidden compartment because of details he observed immediately at the beginning of his search.  *Id.* at 817.  The First Circuit held that the discovery of the loaded gun in the first hidden compartment provided sufficient probable cause to support the continued search of the defendant's car for a second trap compartment.  *Id.* at 818-819.  In holding the entirety of the search lawful, the First Circuit emphasized that there are no fixed time limits when determining the permissible duration of a warrantless search.  *Id.* at 825 (. . ."[I]t took only five minutes for the officers to find the loaded gun.").

In this case, the squad car video shows six or seven officers searching the vehicle by opening the doors, glove compartment, trunk, hood, dash, and other areas for approximately five

---

[16] Case law in this jurisdiction involving protective searches of hidden compartments is sparse.

minutes.   (Gov't Ex. 2, at 17:28-17:33).   One officer spent several minutes searching the dash and front passenger side of the car, which was the same area that Sergeant Nelson searched after the interview concluded.   (*Id.*)   The officers conducted an exhaustive search and found one bag of marijuana in plain view.   (*Id.*)   In contrast to *McGregor*, there was no testimony as to whether during the first search officers suspected that Rosas' car contained a hidden compartment.   650 F.3d at 817-818.   The tip also did not specify whether the gun was located on Rosas' person or in his car.   *Cf. Guzman*, 2010 WL 234730, at *2 (recounting tip that defendant would be carrying drugs in a hidden compartment in dashboard); *Torres*, 2011 WL 2209144, at *1 (emphasizing that informant stated that defendant had gun in hidden compartment behind car speaker panel). Despite these deficiencies, the tip minimally satisfied the reasonable suspicion required to conduct a protective search of Rosas' person and car for weapons; the first warrantless search was lawful.

### 4.   The Automobile Exception and Probable Cause.

Officers did not have a warrant to search Rosas' vehicle, nor did they make any attempt to obtain one.   Nevertheless, Officer Lepinski's discovery of marijuana in plain sight in Rosas' car provided sufficient probable cause for the first full search of Rosas' car and its compartments based on the automobile exception.

The automobile exception to the warrant requirement allows police officers to conduct a warrantless search of a vehicle and containers within the vehicle whenever probable cause exists. *California v. Acevedo*, 500 U.S. 565, 580 (1991); *United States v. Sample*, 136 F.3d 562, 564 (8th Cir. 1998).   Under this exception, police may search a vehicle if they have probable cause to believe that the vehicle contains contraband.   *United States v. Payne*, 119 F.3d 637, 642 (8th Cir. 1997) (citing *Chambers v. Maroney*, 399 U.S. 42, 51 (1970)).   In such circumstances, police may

search every part of the car and its contents that may conceal the object of the search or evidence of a crime. *Id.* (citing *Acevedo*, 500 U.S. at 573-76); *see United States v. Thompson*, 906 F.2d 1292, 1298 (8th Cir. 1990).

"Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *United States v. Nolen*, 536 F.3d 834, 839 (8th Cir. 2008) (quoting *United States v. Fladten*, 230 F.3d 1083, 1085 (8th Cir. 2000)) (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). The collective knowledge doctrine holds that if there is communication between officers, the knowledge of all officers on a team is imputed to the individual members of the team. *United States v. v. Thompson*, 533 F.3d 964, 970 (8th Cir. 2008) (citing *United States v. Banks*, 514 F.3d 769, 776 (8th Cir. 2008)). When officers conducting a *Terry* search find drugs or drug paraphernalia in plain view, officers have probable cause to search other parts of the car for additional contraband or evidence. *See United States v. Rowland*, 341 F.3d 774, 785 (8th Cir. 2003) (citing *United States v. Reinholz*, 245 F.3d 765, 776 (8th Cir. 2001)); *United States v. Jones*, No. 10-335, 2011 WL 1831603, at *3 (D. Minn. May 12, 2011).

Officer Lepinski testified that he saw a bag of marijuana on the gear shifter of Rosas' car in plain sight and made a drawing showing the location of the drugs at the pretrial motions hearing. (Gov't Ex. 5); (Tr. 21, 50). Rosas disputes Officer Lepinski's claim asserting that an officer on the squad video is asked whether he found anything and responds, "Nah. Not yet." (Gov't Ex. 2, at 17:30-31). The Court reviewed the video and cannot conclusively determine what the unidentified officer said and to what the officer was referring. (Gov't Ex. 2, at 17:30-31). Significantly, Rosas himself acknowledged the location of the marijuana on the gear shifter and ownership of the drugs during the SCALES interview. (Gov't Ex. 1, at 00:6:19-6:34). The

Court is satisfied that despite other inconsistencies in Officer Lepinski's testimony, his assertion that he found marijuana in plain view is credible. *Id.* This discovery created sufficient probable cause to search the entire car including closed containers. *See Rowland*, 341 F.3d at 785; *Jones*, 2011 WL 1831603, at *3. Had Sergeant Nelson discovered the hidden compartment containing the gun during the first warrantless search, the Court's analysis would end here. The *unMirandized* squad car interview, however, created a break in the chain of events that requires additional analysis.

**B. The Second Warrantless Search that Yielded the Gun Was Unlawful.**

**1. The Tip Did Not Establish Probable Cause to Justify the Second Warrantless Search**.

The Court will next evaluate whether the tip was sufficient to establish probable cause to justify Sergeant Nelson's second full blown warrantless search of Rosas' car. Courts evaluate whether a tip is sufficiently credible and reliable to establish probable cause in the totality of the circumstances. *See Gates*, 462 U.S. at 230-31; *see United States v. Buchanan*, 574 F.3d 554, 561-62 (8th Cir. 2009). "An informant's tip may be sufficiently reliable to support a probable-cause determination if the informant has previously provided reliable information or if the tip is corroborated by independent evidence." *United States v. Leppert*, 408 F.3d 1039, 1042 (8th Cir. 2005). The factors courts consider in evaluating whether a tip establishes probable cause are: 1) the "richness of detail of a first-hand observation;" 2) whether the statement was against the informant's penal interest; and 3) the extent to which an agent or officer meets personally with an informant to question him and assess his credibility. *See, e.g., Tyler*, 238 F.3d at 1039 (internal citation omitted); *United States v. Robertson*, 39 F.3d 891, 893 (8th Cir. 1994); *United States v. Jackson*, 898 F.2d 79, 81 (8th Cir. 1990). If an independent police investigation "at least partially corroborate[s]" the information the informant provides, a court may consider an

informant reliable.  *Buchanan*, 574 F.3d at 562; *see United States v. Flagg*, 919 F.2d 499, 500 (8th Cir. 1990).

Here, the tip created minimal reasonable suspicion justifying the first search but fell short of establishing probable cause to support a second full warrantless search.  Presumably, Sergeant Nelson sought to search Rosas' car a second time based on the tip; she offered no other basis in her testimony.  (Tr. 68-69).  Yet, the tip did not contain any information regarding the gun's specific location.   (Tr. 77-78).  The level of detail in the tip is insufficient in comparison to similar cases where there was probable cause to conduct a full search.  *See, e.g., Jackson*, 898 F.2d at 81 (holding anonymous phone tip that identified the source of the tip and provided substantial details such as the height of marijuana plants and location of bags of marijuana was sufficient to establish probable cause); *Guzman*, 2010 WL 234730, at *2 (recounting tip alleging contraband in a hidden dash compartment); *Torres*, 2011 WL 2209144, at *1 (emphasizing informant provided location of hidden compartment containing a gun behind car speaker panel). Here, the paucity of detail about the tipster's background and history of providing reliable information precludes a finding of probable cause.  *See Tyler*, 238 F.3d at 1039 (explaining that "statements against the penal interest of an informant typically 'carry considerable weight'") (quoting *United States v. LaMorie*, 100 F.3d 547, 553 (8th Cir. 1996)); *Robertson*, 39 F.3d at 893 (emphasizing that information gained from an in-person meeting with an informant created more reliability rather than simply taking a telephone tip)).

The impermissible questioning during the squad car interview undermines the Government's efforts to meet its burden to establish that the gun was obtained legally.  *See Connelly*, 479 U.S. at 168.  The second search occurred after an *unMirandized* interview peppered with multiple threats.  (Gov't Ex. 2, at 17:38, 17:43-44); (Tr. 53).  Worse yet, one

officer issued a deportation ultimatum aimed at obtaining the object found in the second warrantless search: the previously undiscovered loaded handgun. (Gov't Ex. 2, at 17:44). If credible testimony was offered as to the subject matter of the squad car interview after Officer Lepinski turned off the tape, then the Court may have reached a different conclusion.

This Court does not know whether Rosas revealed the location of the gun to officers during the 33 minutes that the tape was turned off, nor was any evidence or testimony probative to that precise issue offered.[17] But, when the Government bears the burden of proof to establish that the evidence seized was obtained lawfully, this Court finds the intentional elimination of proof to that effect perplexing. Had the video recorded the events that occurred between 5:45 p.m. and 6:18 p.m., including the discovery of the gun, documentation corroborating the officers' testimony would be available—it is not and its absence is troubling. Officer Lepinski's actions tarnish the integrity of law enforcement, and, in this case, undercut the Government's efforts to meet its burden. Discrediting inconsistent or inaccurate testimony is within the Court's discretion and justified. *See Foster*, 752 F. Supp. 2d at 1063; *see also Torres*, 2011 WL 2209144, at *3. Because the Court finds the second warrantless search unlawful, for completeness, the Court will briefly address the relevant exceptions to the exclusionary rule and the warrant requirement.

---

[17] The Government asserts that the SCALES interview "corroborates Officer Lepinski's testimony that the Defendant made no admissions regarding the gun during the squad interview and that, in fact, the gun was not located until after the pre-arrest squad interview ended." (Gov't Mem. at 28-29). The passage the Government cites in support of this proposition does not relate directly to the events that occurred when the squad car video was turned off but merely confirms that officers found a gun that Rosas purchased a month and a half earlier. (Gov't Ex. 1, at 00:06:46-00:07:37).

**2.  Alternative Exceptions to the Warrant Requirement.**

**i.  Search Incident to Arrest.**

The search incident to arrest exception does not extend to the hidden compartment because Rosas was in custody in the back of the squad car at the time of the search.  In a footnote, the Government argues in the alternative that the search yielding the gun was lawful as a search incident to arrest for drug possession.  The Court disagrees.  In *Arizona v. Gant*, the Supreme Court held that:

> Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe that a vehicle contains evidence of the offense of arrest. When these justifications are absent, a search of an arrestee's vehicle will be unreasonable unless police obtain a warrant or show that another exception to the warrant requirement applies.

556 U.S. 332, 501 (2009).  The traffic violations alone would not have led to Rosas' arrest, nor would the tip information in the absence of discovering a gun.  Because Rosas was detained in the squad car during the search it would have been physically impossible for Rosas to access a weapon in the hidden compartment of his car.  The scope of a valid search incident to arrest would not, therefore, extend to the hidden compartment where Sergeant Nelson discovered the gun.  *Gant*, 556 U.S. at 501.

**ii.  Inventory Search.**

In an inventory search, the Government bears the burden to show by a preponderance of the evidence that law enforcement complied with the relevant impoundment and inventory procedures.  *United States v. Kennedy*, 427 F.3d 1136, 1143 (8th Cir. 2005).   The Government must show that there was "some degree of 'standardized criteria' or 'established routine' that regulates an inventory search."  *United States v. Petty*, 367 F.3d 1009, 1012 (8th Cir. 2004) (quoting *Florida v. Wells*, 495 U.S. 1, 4 (1990)).  No evidence about impoundment was offered,

nor was any evidence regarding Minneapolis Police Department impoundment procedures offered.  The inventory search exception to the warrant requirement does not apply.

### 3.   Exceptions to the Exclusionary Rule Do Not Apply to the Second Search.

#### i.   Attenuated Connection Exception.

The attenuated connection exception provides that if the chain of connection between the challenged evidence and the primary taint of illegality is too long or is linked only by sophisticated argument, then exclusion is not warranted.  *See Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963).  Such attenuation is not present here.  The impermissible questions and threats in this case were relevant to Rosas' possession of a gun.  The Court has little doubt that coercive statements such as, "Give us a gun, today . . . . give us somebody else's gun if you're not going to give us yours" relate to the fruit of the illegal second search.  (Gov't Ex. 2, at 17:44); (Tr. 53).

#### ii.   Independent Source Exception.

To meet the independent source exception, the Government must show that it derived the evidence from a lawful source independent of the illegal conduct creating the primary taint. *Murray v. United States*, 487 U.S. 533, 537-38 (1988).  Albeit providing reasonable suspicion, the tip information did not create probable cause for the second warrantless search.  The Court does not see any other independent basis for the second search.

#### iii.   Inevitable Discovery Exception.

To meet this exception, the Government must establish that the challenged evidence would have been discovered inevitably without reference to the illegal conduct creating the primary taint.  *See Nix v. Williams*, 476 U.S. 431, 441 (1984); *Garreau*, 735 F. Supp. 2d at 1165 (holding the inevitable discovery doctrine applies when there is another investigation or when

the driver has no license and the vehicle would have to be impounded).  There are two prongs of the inevitable discovery doctrine: 1) there exists a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct; and 2) the government was actively pursuing a substantial alternative line of investigation at the time of the constitutional violation.  *See*, *e.g.*, *United States v. Munos*, 590 F.3d 916, 923 (8th Cir. 2010); *United States v. Thomas*, 524 F.3d 855, 858 (8th Cir. 2008); *United States v. Pruneda*, 518 F.3d 597, 604 (8th Cir. 2008).

Officers had several viable, lawful alternatives for searching Rosas car.  In *United States v. Guzman*, No. 09-234, 2010 WL 234730, at *5 (D. Minn. Jan. 14, 2010), law enforcement waited to push the button activating a secret compartment in the defendant's car until after obtaining a search warrant even though a tip asserting that defendant possessed drugs in a hidden compartment was corroborated.  Similarly, in *United States v. Valencia*, No. 06-162, 2006 WL 2385154, at *4 (D. Minn. Aug. 17, 2006), officers did not conduct a second search of a hidden compartment until after the car was impounded despite a credible tip that drugs were on the defendant's person or in a secret compartment in his car.  Here, instead of towing Rosas' vehicle or attempting to obtain a warrant after efforts at the scene were exhausted, officers conducted an *unMirandized* interview of Rosas.  No testimony or other evidence was offered as to whether officers intended to apply for a search warrant or impound Rosas' car.  Thus, the Court finds no reasonable probability that officers would have discovered the gun through alternative lawful means such as a subsequent inventory search or a search warrant.

**C.  The Squad Car Interview Statements Should be Suppressed.**

   **1.  Rosas Was in Custody During the Second Search and *UnMirandized* Squad Car Interview.**

A law enforcement officer must advise a person of his *Miranda* rights before interrogating a suspect in a custodial setting.  *Miranda v. Arizona,* 384 U.S. 436, 444 (1966); *Illinois v. Perkins*, 496 U.S. 292, 297 (1992).  *Miranda* defines custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."  *United States v. Hogan*, 539 F.3d 916, 921 (8th Cir. 2008) (citing *Miranda*, 384 U.S. at 444).  An interrogation includes either express questioning or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response.  *Id.*; *United States v. Howard*, 532 F.3d 755, 762 (8th Cir. 2008); *United States v. Torres-Lona*, 491 F.3d 750, 757 (8th Cir. 2007).  The "determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."  *Stansbury v. California*, 511 U.S. 318, 323 (1994).  The Eighth Circuit identified several non-exhaustive "indicia of custody" to aid courts in determining whether a *Miranda* warning was required:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990); *see United States v. Flores-Sandoval*, 474 F.3d 1142, 1146-47 (8th Cir. 2007).

Analyzing these factors, Rosas was in custody in the squad car; a *Miranda* warning was required. First, the officers did not at any point inform Rosas that his cooperation was voluntary and that he was free to leave. He was handcuffed and placed in a squad car with two officers standing in the open door blocking him in; he did not have freedom of movement. (Tr. 21, 23-24). Second, Rosas did not initiate the contact with officers, but rather was detained as part of a felony stop to search for weapons. (Tr. 44, 59-60). Third, and most significantly, several officers threatened Rosas with deportation if he did not reveal where the gun was hidden. (Gov't Ex. 2, at 17:43-44); (Tr. 53). Though officers may inquire into the circumstances that led to the protective search, threats such as "We can deport your ass tomorrow" and insinuations of physical harm such as, "If we were going to show you non-respect right now, you'd still be on the ground bleeding, alright?" create a coercive environment. (Gov't Ex. 2, at 17:38, 17:44). *See Berkemer v. McCarty*, 468 U.S. 420, 439-40 (1984) (holding that during a *Terry* stop, an officer may ask the detainee questions "'reasonably related'" to the justification for the stop including inquiries regarding the detainee's identity and "information confirming or dispelling the officer's suspicions.") (quoting *Terry v. Ohio*, 392 U.S. 1, 29 (1968)). Finally, Rosas was placed under arrest at the conclusion of the interview, though the Court is not clear as to the timing because Officer Lepinski turned off the squad video. There is no doubt that Rosas was in custody during the interview and that the failure to even make a colorable attempt to recite Rosas' *Miranda* rights violated the Fifth and Sixth Amendments.

### 2.   Officers Violated *Miranda* During the Squad Car Interview.

Though the Government does not intend to use any of Rosas' statements in the squad car as part of its case in chief, the Court nevertheless will analyze the extent to which these unlawfully obtained statements taint the SCALES interview.   (Gov't Mem. at 19).   When conducting a *Terry* stop, "[t]he officer may ask the detainee questions in order to dispel or confirm his suspicions, but questioning is limited in scope to the circumstances that justified the stop." *United States v. McGauley*, 786 F.2d 888, 890-91 (8th Cir. 1986).   "During an investigatory detention, an officer must employ the least intrusive means of detection reasonably necessary to address the officer's reasonable suspicion." *Guzman*, 2010 WL 234730, at *7 (citing *United States v. Navarrete-Barron*, 192 F.3d 786, 790 (8th Cir.1999).   "Asking questions and seeking to obtain consent to search . . . [are] reasonable and permissible methods of continuing the investigation that did not unduly prolong the detention." *United States v. Gill*, 513 F.3d 836, 845 (8th Cir. 2008).

Here, it was permissible for officers to ask Rosas his name and address.   *See McGauley*, 786 F.2d at 890-91.   Under *Navarrete-Barron*, officers could also lawfully inquire into Rosas' recent whereabouts.   192 F.3d at 790.   Such questions are considered biographical and are necessary to investigating officers' reasonable suspicions.   *Guzman*, 2010 WL 234730, at *7. Yet, the officers questioning Rosas, including Sergeant Nelson, went beyond such questions by making threats such as, "It's one trip down, all the way for deportation."   (Gov't Ex. 2, at 17:44); (Tr. 53).   Special Agent Ouse's threats were even more directly aimed at eliciting a confession, "Get me a gun. . . .   If you don't have a gun, get me someone who has a gun. . . . Or I'll deport you."   (Tr. 52-53); (Gov't Ex. 2, at 17:44).   These statements exceed the scope of permissible

questioning of a suspect in the absence of a *Miranda* warning and constituted more than "just asking [Rosas] his name" as Sergeant Nelson testified at the pretrial motions hearing.  (Tr. 66).[18]

### D.  Voluntary Statement Made to Officer Lepinski Should Not be Suppressed.

The Court found the first squad car interview to be an unlawful custodial interrogation containing coercive threats conducted in violation of *Miranda*.  Nonetheless, *Miranda* applies to "custodial interrogations," but is not applicable to all statements made while a suspect is in custody.  *Miranda*, 384 U.S. at 444; *see Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) ("Interrogation in the *Miranda* context refers to express questioning and to words or conduct that officers should know is "reasonably likely to elicit an incriminating response.").

Rosas made the statement that he had the gun for protection without any prompting from Officer Lepinski.  (Tr. 33-34).  Moreover, Officer Lepinski did not question Rosas during the unlawful squad car interview.  (Tr. 24).   In *United States v. Briones*, 390 F.3d 610, 613 (8th Cir. 2005), the Eighth Circuit held admissible defendant's statements that were "blurted out" after an *unMirandized* interview and without any officer questioning.  The Eighth Circuit reasoned that the defendant's voluntary statement was admissible because it "'was not the product of either express questioning or its functional equivalent.'"  *Id*. (quoting *United States v. McGauley*, 786 F.2d 888, 891 (8th Cir. 1986)).

Similarly, Rosas was not responding to a question when he asserted that he had the gun for protection.  (Tr. 33-34).  In fact, Officer Lepinski did not substantively question Rosas during the squad car interview.  (Tr. 24).  Officer Lepinski did not respond to Rosas' comment and continued filling out Rosas' arrest paperwork.  (Tr. 32).  Though the statement was preceded by an unlawful *unMirandized* interview, such facts do not support the conclusion that it was part of

---

[18] The Court finds Officer Lepinski's and Sergeant Nelson's statements that they did not believe that a *Miranda* warning was needed disconcerting.  (Tr. 27, 66).

an "interrogation" in the context of *Miranda*.  *See Innis*, 446 U.S. at 301.  Rosas' voluntary

statement to Officer Lepinski was lawfully obtained and should not be suppressed.

### E. Statements Made During the Third Precinct SCALES Interview Should Not be Suppressed.

The squad car interview and the SCALES interviews do not implicate a mid-stream

*Miranda* analysis under *Missouri v. Siebert*, 542 U.S. 600, 615 (2004).  *Siebert* applies when law

enforcement "deliberately used separate interrogations to elicit incriminating statements through

belated *Miranda* warnings."  *See Briones*, 390. F.3d at 613 (citing *Missouri v. Siebert*, 542 U.S.

600 (2004)).  In the absence of a "deliberate two-step strategy" to circumvent *Miranda*, *Elstad v.

Oregon*, 470 U.S. 298, 309 (1985) rather than the *Siebert* plurality factors determines whether

statements made in a second interview are admissible.  *See Siebert*, 542 U.S. at 622, (Kennedy,

J., concurring).

In contrast to *Siebert*, Rosas did not make incriminating statements in the first interview.

Thus, law enforcement could not have used the SCALES interview to circumvent *Miranda* as

did the officer in *Siebert*.[19]  542 U.S. at 613-14.  Rosas points to Officer Lepinski's statement,

"As I said before," at the beginning of the SCALES interview as evidence of a continuation of a

previous conversation. (Gov't Ex. 1); (Tr. 57).  This argument presupposes that Officer

Lepinski's testimony that he did not ask Rosas any questions during the squad car interview was

not credible.  (Tr. 24).  Despite other inconsistencies in Officer Lepinski's testimony, the squad

video corroborates Officer Lepinski's account that he did not interrogate Rosas until they

---

[19] *See supra* note 17 (rejecting Government's contention that the SCALES interview conclusively demonstrated that Rosas did not reveal the location of the gun to officers at the scene).

reached the Third Precinct.[20] The sequence of events is also distinguishable from *Seibert* because the time between the unlawful squad car interview and the SCALES interview was approximately 30 to 45 minutes, which is nearly twice as long as the 15 to 20-minute break in *Siebert*. (Tr. 40); (Gov't Ex. 2, at 17:29-45); *see* 542 U.S. at 616. Additionally, the SCALES interview occurred at a different location with a different interrogator. *Id.* As such, there was no deliberate attempt by law enforcement to circumvent *Miranda* through a two-part interview.[21]

To determine whether the SCALES interview was tainted by the squad car interview, the Court must inquire as to whether a "careful and thorough administration of *Miranda* warnings serves to cure a condition that rendered the unwarned statement admissible." *Elstad*, 470 U.S. at 311. If coercive acts by law enforcement overcome a defendant's free will, a subsequent *Miranda* warning may be insufficient. *Id.* at 311-313. Rosas was repeatedly threatened during the squad car interview while he was in custody in the squad car, though the atmosphere was not so police-dominated and coercive as to overcome Rosas' free will entirely. (Gov't Ex. 2, at 17:29-45). During the SCALES interview, Officer Lepinski thoroughly and clearly read Rosas his *Miranda* rights and insisted upon Rosas' confirmation of those rights and desire to proceed in English. (Gov't Ex. 1, at 00:02:18-3:43). Twice at the beginning and once at the end of the 13-minute interview, Officer Lepinski asked Rosas if his cooperation was voluntary and if he understood his *Miranda* rights; he replied affirmatively three times. (Gov't Ex. 1, at 00:02:06,

---

[20] Because the squad car video was turned off and no testimony was offered as to the substance of the questioning that occurred after the video was turned off, the Court cannot make a conclusive determination regarding the extent of the *Miranda* violation that occurred.

[21] Even if the Court were to have found that law enforcement tried to evade *Miranda* deliberately, the *Siebert* factors do not weigh in favor of suppression of the SCALES interview. *See Siebert*, 542 U.S. at 615 (2004). The change of location and interrogator coupled with the 30 to 45 minutes that passed and absence of a recorded confession in the squad car do not constitute a two-part interview. *Id.* The level of detail and subject matter of the SCALES interview was significantly more in-depth than was the squad car interview questions. *Id.* The squad car and SCALES interviews were factually and temporally distinct.

00:03:45, 00:13:09-25).   This thorough administration of *Miranda*, although preceded by coercive police threats, is sufficient to render Rosas' statements lawful under *Elstad*. 470 U.S. at 318.   Rosas' statements in the SCALES interview were obtained lawfully and should not be suppressed.

**F.  Defendant's Motion to Make Informant Available for Interview Should be Denied.**

The defendant has the burden to demonstrate the need for disclosure of an informant's identity.  *See United States v. Crenshaw*, 359 F.3d 977, 1005 (8th Cir. 2004).   A court must weigh the defendant's right to the information against the government's privilege to withhold the identity of its confidential informants.  *Id.*   An informant need only be revealed or made available for interview if to do so would be "relevant and helpful" to the defense or would be "essential to a fair determination of cause." *Rovario*, 353 U.S. at 53.   An individual who did not witness or participate in the offense but simply conveys information is a "mere tipster." *Bourbon*, 819 F.2d at 860.   If a tipster's involvement was limited to providing information relevant to a probable cause determination, disclosure is not automatically required at the pretrial stage.  *See McCray v. Illinois*, 386 U.S. 300, 309-310 (1967) (distinguishing *Rovario* and differentiating between pretrial and trial motions to disclose informants because a trial motion aimed at witness disclosure goes to the "fundamental" issue of "innocence or guilt").

Neither party disputes that the confidential informant in this case was not a percipient witness or a participant in the underlying offense. (Tr. 7-8).   Based on *Bourbon*, the confidential informant is a mere tipster for the purposes of determining whether disclosure is required.  819 F.2d at 860.   At the pretrial motions hearing, Rosas' counsel stated that the instant motion is relevant to assessing the informant's reliability in the context of a probable cause analysis rather than a trial witness availability issue.  (Tr. 6-7).   The Government's opposition to providing

information regarding the informant attenuated its efforts to establish probable cause to search the car for a second time based solely on the tip.   Because the Court finds the partially corroborated tip inadequate to establish probable cause without more information about the tipster, Rosas' *Rovario* fairness and relevance arguments are moot.  353 U.S. at 53.  As such, the tipster need not be identified nor made available to Rosas for an interview.  *See Rovario*, 353 U.S. at 53; *McCray*, 386 U.S. at 309-310.

## IV.   RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.  Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Doc. No. 21] should be **GRANTED in PART** and **DENIED in PART** as follows:

    a.  To the extent that Rosas seeks to suppress the marijuana seized from the first search, the motion should be **DENIED**;

    b.  To the extent that Rosas seeks to suppress the gun seized from the second search, the motion should be **GRANTED**;

2.  Defendant's Motion to Suppress Statements, Admissions, and Answers [Doc. No. 22] should be **GRANTED in PART and DENIED in PART** as follows:

    a.  To the extent that Rosas seeks to suppress statements he made during squad car interview, the motion should be **GRANTED**;

    b.  To the extent that Rosas seeks to suppress his voluntary statement in the squad car to Officer Lepinski after his arrest and not in response to questioning, the motion should be **DENIED**;

    c.  To the extent that Rosas seeks to suppress statements made during his SCALES Interview at the Third Precinct, the motion should be **DENIED**;

3.   Defendant's Motion to Disclose and Make Informant Available for Interview [Doc. No.

17] be **DENIED**.

Dated: November 23, 2011

*s/ Steven E. Rau*_____
STEVEN E. RAU
United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and serving all parties by **December 7, 2011**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.   Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.   This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.